UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TERESA A. NIX,

                          Plaintiff,          07-CV-344

                                              **DECISION**
                    v.                        **and ORDER**

MICHAEL J. ASTRUE, Commissioner
of Social Security

                          Defendant.

_____

## INTRODUCTION

Plaintiff Teresa A. Nix ("plaintiff") brings this action
pursuant to Title II of the Social Security Act ("The Act") seeking
review of a final decision of the Commissioner of Social Security
("Commissioner") denying her application for Disability Insurance
Benefits.  Specifically, the plaintiff alleges that the decision of
the Administrative Law Judge ("ALJ") Karl Alexander denying her
application for benefits was not supported by substantial evidence
in the record and was contrary to applicable legal standards.

The plaintiff moves for judgment on the pleadings pursuant to
Fed. R. Civ. P. 12(c) and 42 U.S.C. 405(g) seeking to reverse the
Commissioner's decision or, in the alternative, remand to the
Commissioner for reconsideration of the evidence.  The Commissioner
cross-moves for judgment on the pleadings pursuant to 42 U.S.C.
405(g) on the grounds that the findings of fact of the Commissioner
are supported by substantial evidence. For the reasons discussed
below, I hereby deny the Commissioner's cross-motion for judgment

on the pleadings, grant plaintiff's motion for judgment on the pleadings, and remand this claim to the Commissioner for further proceedings consistent with this decision.

## BACKGROUND

On July 16, 2004, the plaintiff filed an application for Social Security Disability Insurance ("SSDI") Benefits under sections 216(i) and 223(a) of the Social Security Act, alleging disability due to back disorder (discogenic and degenerative) and headaches, with an onset date of December 8, 2003. The plaintiff's application was denied at the initial and reconsideration disability determination levels. The plaintiff timely requested a hearing before an ALJ, and appeared before Judge Karl Alexander with a non-attorney representative on June 20, 2006.

In a decision dated July 20, 2006, the ALJ determined that the plaintiff was not disabled. The ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner") when the Social Security Appeals Council denied plaintiff's request for review on March 30, 2007. On May 30, 2007, the plaintiff filed this action.

## Discussion

### I. Jurisdiction and Scope of Review

Title 42, section 405(g) of the United States Code grants jurisdiction to Federal District Courts to hear claims based on the denial of Social Security benefits. Matthews v. Eldridge, 424 U.S. 319, 320 (1976). Additionally, the section directs that when

considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. See Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998); see also Williams v. Comm'r of Soc. Sec., No. 06-2019-cv, 2007 U.S. App. LEXIS 9396, at *3 (2d Cir. Apr. 24, 2007).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Section 405(g) thus limits this Court's scope of review to two inquiries: (i) whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole, and (ii) whether the Commissioner's conclusions are based upon an erroneous legal standard. Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003); see also Wagner v. Secretary of Health & Human Serv., 906 F.2d 856, 860 (2d Cir. 1990)(holding that review of the Secretary's decision is not de novo and that the Secretary's findings are conclusive if supported by substantial evidence).

The plaintiff and the Commissioner both move for judgment on the pleadings pursuant to 42 U.S.C. 405(g) and Rule 12(c) of the Federal Rules of Civil Procedure. Section 405(g) provides that the District Court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of social Security, with

or without remanding the cause for a rehearing." 42 U.S.C.
§405(g)(2009). Under Rule 12(c), judgment on the pleadings may be
granted where the material facts are undisputed and where judgment
on the merits is possible merely by considering the contents of the
pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642
(2d Cir. 1988). If, after a review of the pleadings, the Court is
convinced that "the plaintiff can prove no set of facts in support
of [her] claim which would entitle [her] to relief," judgment on
the pleadings may be appropriate. See Conley v. Gibson, 355 U.S.
41, 45-46 (1957).

A District Court should order payment of Social Security
disability benefits in cases where the record contains persuasive
proof of disability and remand for further evidentiary proceedings
would serve no further purpose. See Carroll v. Secretary of Health
and Human Serv., 705 F.2d 638, 644 (2d Cir. 1981). The goal of
this policy is "to shorten the often painfully slow process by
which disability determinations are made." Id. Because this Court
finds that (1) the ALJ's decision was not supported by substantial
evidence and (2) the record contains substantial evidence of
disability such that further evidentiary proceedings would serve no
further purpose, judgment on the pleadings is hereby granted for
the plaintiff.

II. Standard for Entitlement to SSDI Benefits

Under the Social Security Act, a disability is defined as the
"inability to engage in substantial gainful activity by reason of

-4-

a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C. §423(d)(1)(A) (concerning Old-Age, Survivors', and Disability Insurance); 42 U.S.C. §1382c(a)(3)(A)(concerning SSI payments). An individual will only be considered "under a disability" if his impairment is so severe that he is both unable to do his previous work and unable to engage in any other kind of substantial gainful work that exists in the national economy. §§423(d)(2)(A) and 1382c(a)(3)(b).

"Substantial gainful work" is defined as "work that exists in significant numbers either in the region where the individual lives or in several regions of the country." Id. Work may be considered "substantial" even if it is done on a part-time basis, if less money is earned, or if work responsibilities are lessened from previous employment. 20 C.F.R. § 404.1572(a); 20 C.F.R. § 416.972(a). Work may be considered "gainful" if it is the kind of work usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b) and 416.972(b). Furthermore, "substantial gainful work" is considered available to an individual regardless of whether such work exists in his immediate area, whether a specific job vacancy exists for him, or whether he would be hired if he were to apply for work. 42 U.S.C. §§423(d)(2)(A) and 1382c(a)(3)(B).

In determining whether or not a claimant is disabled, SSA regulations require the ALJ to perform the following five-step sequential evaluation:

(1)  if the claimant is performing substantial gainful work, he is not disabled;

(2)  if the claimant is not performing substantial gainful work, his impairment(s) must be "severe" before he can be found disabled;

(3)  if the claimant is not performing substantial gainful work and has a "severe" impairment(s) that has lasted or is expected to last for a continuous period of at least 12 months, and if the impairment(s) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry;

(4)  if the claimant's impairment(s) do not meet or medically equal a listed impairment, the next inquiry is whether the claimant's impairment(s) prevent him from doing his past relevant work, if not, he is not disabled;

(5)  if the claimant's impairment(s) prevent him from performing his past relevant work, and other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v)(2009).
After determining that the plaintiff met the insured status
requirements of the Social Security Act under sections 216(i) and
223, the ALJ performed the required five-step evaluation and
determined that: (i) the plaintiff had not engaged in substantial
gainful activity since her alleged onset date of December 8, 2003;
(ii) the plaintiff's cervical and lumbar degenerative disc
disease/degenerative arthritis and headaches were "severe" under
20 C.F.R. § 404.1520(c); (iii) the plaintiff's impairments did not
meet or medically equal any of the listed impairments in 20 C.F.R.
Part 404, Subpart P, Appendix 1;(iv) the plaintiff was unable to
perform any past relevant work as a legal secretary; and (v) the
plaintiff retained the residual functional capacity ("RFC") to
perform a range of sedentary work.[1]

---

[1] The ALJ also found that the Plaintiff requires a sit/stand option at
will, could perform postural movements occasionally except cannot climb
ladders, ropes or scaffolds, should not be exposed to temperature extremes or
hazards, and should work in a low stress environment with no production line
type of pace or independent decision making responsibilities. The ALJ noted
that the "limitations relating to low stress are not because of any medically
determinable mental impairment, but simply based on the claimant's subjective
complaints of headaches, which the undersigned believes would be less likely
to occur in a low stress environment." (Tr. at 18).

III. **The ALJ's decision to deny plaintiff benefits is not supported by substantial evidence contained in the record, and contains errors of law.**

A. <u>The ALJ failed to make adequate findings and articulate adequate reasons to support his determination that the plaintiff lacked credibility.</u>

In making his RFC determination, the ALJ stated that he "did not find the [plaintiff] to be entirely credible based on *some* of her statements and *other evidence* in the record." (Tr. at 18; emphasis mine). He went on to provide only two examples to substantiate his finding. First, he noted that "although [the plaintiff] complains of essentially constant headaches it was noted ... during a neurologic consultation examination ... that the [plaintiff] does get 'some headaches.' This does not indicate constant headaches." (Tr. at 18). Second, after noting that the plaintiff had a normal MRI of the brain and abnormal spinal MRIs,[2] the ALJ stated "[t]he [plaintiff] reported that she cooks three times a week, does light housework as needed, does laundry three to four times a week, goes shopping a few times a week, cares for her children, goes to church and socializes with friends. These activities are not indicative of total disability." (Tr. at 18). The ALJ then concluded

> "[f]or the foregoing reasons [he] does not find the claimant to be entirely credible and does not fully accept her statements

_____

[2] The ALJ stated, "cervical MRI showed significant stenosis and a lumbar CT scan showed some mild degenerative disease." (Tr. at 18).

concerning her symptoms and limitations. The [plaintiff] has medical impairments that could reasonably be expected to cause some of the symptoms described, and [he] believes that the [plaintiff] does experience some lumbar and cervical pain, and headaches from time to time, but not to the frequency and severity alleged." (Tr. at 18).

As a general rule, it is the Secretary's function to resolve issues of credibility and conflicting evidence where such determinations are supported by substantial evidence and are not inconsistent with the record. Gates v. Astrue, 2009 U.S.App. LEXIS 15643, *2 (2d Cir. 2009)(citing Aponte v. Sec'y, Dep't of Health & Human Servs. Of the United States, 728 F.2d 588 (2d Cir. 1984)). Further, credibility determinations should only be disturbed by a reviewing court if "the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported." Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006)(citing Zurawski v. Halter, 245 F.3d 881, 887-88 (7th Cir. 2001)). Especially where a claimant alleges disability due to an inherently subjective complaint such as pain, an ALJ must necessarily base his decision on the claimant's credibility. Sims, 442 F.3d at 537-38.

However, 20 C.F.R. § 404.1529 and subsequent Agency ruling SSR 96-7p provide guidelines for making credibility determinations where disability claims are based on symptoms of pain. Under the regulations, the SSA states it will "consider all [of a claimant's] symptoms, including pain, and the extent to which [these] symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a)(2009). The regulations go on to define "objective medical evidence" as "medical signs and laboratory findings."[3] Id. Medical signs are "anatomical, physiological, or psychological abnormalities which can be observed ... [s]igns must be shown by medically acceptable *clinical* diagnostic techniques."[4] (emphasis mine). Id

In terms of "other evidence," the regulations note that "[s]ince symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." 20 C.F.R. § 404.1529(c)(3)(2009). Thus, where an ALJ believes that reported complaints are in excess of those that are supported by objective medical evidence, the ALJ must consider the following seven factors: (i) a claimant's daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of medication a claimant takes to alleviate pain or other symptoms; (v) non-pharmacological other treatments the claimant has sought for relief of symptoms; (vi) any other measures a claimant has used

---

[3] As defined in §404.1528(b) and (c). Examples of objective medical evidence provided in the regulations include "evidence of reduced joint motion" and "muscle spasm." 20 C.F.R. § 404.1529(c)(2)(2009).

[4] 20 C.F.R. § 404.1528 (2009).

to alleviate symptoms; (vii) and other factors concerning a claimant's functional limitations and restrictions caused by the reported symptoms.

Here, having found that the plaintiff did have a medical condition that could reasonably be expected to cause some (but not all) of her symptoms,[5] the ALJ subsequently failed to consider the above factors as required under the regulations. To the contrary, the ALJ chose two examples, out of context from the record on the whole, to support his determination.

Under SSR 96-7p, when the existence of a medically determinable physical or mental impairment that could reasonably be expected to cause a claimant's symptoms has been established, if the ALJ believes the symptoms are not substantiated by objective medical evidence, the ALJ must make a finding about the credibility of the claimant to subsequently determine "the intensity, persistence, and functionally limiting effects of the symptoms" as they relate to the claimant's ability to work. The ruling is clear that an ALJ must: obtain additional information when needed to assess credibility; consider the seven factors listed above; consider the entire case record; and "give specific reasons for the weight given to the individual's statements." Further, credibility findings cannot be based on "an intangible or intuitive notion about an individual's credibility;" such findings "should be

---

[5] Tr. at 18.

closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995).

ALJ Alexander first chose an apparent inconsistency in the plaintiff's report of headache as a basis to discredit her subjective complaints. He chose one statement from the report of Dr. Marc Frost, a neurologist whom the plaintiff saw for complaints of facial numbness, as evidence that the plaintiff inconsistently reported the extent of her headaches. The note in question states, "Her ROS [review of systems] is significant for generalized fatigue and weakness. She does get some headaches." (Tr. at 102). Dr. Frost's ultimate opinion was that, although her facial symptoms were unrelated to the cervical spinal abnormalities found on MRI, "[c]ertainly a neuralgia[6] needs to be considered." (Tr. at 103). Based on this note alone, the ALJ concludes "[t]his does not indicate constant headaches." (Tr. at 18).

While a claimant's consistency in reporting symptoms is considered important in making a credibility determination, the SSA makes clear that "the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individuals statements are not credible. Symptoms may vary ... or may worsen or improve with

_____

[6] Neuralgia is defined as "nerve pain; pain of a severe, throbbing or stabbing character in the course or distribution of a nerve." STEDMAN'S MEDICAL DICTIONARY (25th Ed. 1990).

time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms."[7]    Further, the ruling notes that an adjudicator must review the record to determine if there any explanation for the perceived variations in a claimant's report of symptoms.

Here, the ALJ did not discuss any attempt to find an explanation for this apparent inconsistency.  Simply reading Dr. Frost's statement in context, however, reveals an explanation: the plaintiff was not consulting the doctor for treatment of headaches, it is not by any means clear that "some headaches" is a direct quote from the plaintiff in an attempt to fully describe her headaches (versus the doctor's own characterization), and the doctor's brief and singular mention of headaches indicates that this was not part of a detailed query to ascertain the full nature and extent of the plaintiff's headaches.  While it is true that the plaintiff's headaches were only once characterized in the record as severe,[8] it is also true that the plaintiff consistently reported to her doctors that she suffered from headaches.

It is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination.  <u>Robinson v. Barnhart</u>, 366 F.3d 1078, 1083

---

[7] SSR 96-7p.

[8] "Severe neck pain, headaches...." (Tr. at 220).

(10th Cir. 2004)(citing <u>Switzer v. Heckler</u>, 742 F.2d 382, 385-86 (7th Cir. 1984)).  Further, an ALJ "may not ignore an entire line of evidence that is contrary to [his] findings."  <u>Zurawski v. Halter</u>, 245 F.3d 881, 888 (7th Cir. 2001)(citing <u>Henderson v. Apfel</u>, 1769 F.3d 507, 514 (7th Cir. 1999)).  The ALJ here engages in just such a selective analysis of the record both regarding the apparent contradiction in the plaintiff's report of headaches, discussed above, and with the plaintiff's apparent report of her ability to perform activities of daily living ("ADLs").

In finding that the plaintiff's complaints of pain and other symptoms are not credible, the ALJ also notes that she is able to "cook[] three times a week, do[] light housework as needed, do[] laundry three to four times a week, go[] shopping a few times a week, care[] for her children, go[] to church and socialize[] with friends," which is inconsistent with "total disability."  (Tr. at 18.)  However, while this might be construed as an attempt on the part of the ALJ to consider the plaintiff's "daily activities,"[9] the ALJ mis-characterized her ability to function on a daily basis by failing to mention the plaintiff's consistent report of limitations with these ADLs. First, the plaintiff testified at the hearing before the ALJ that she must break tasks  "into pieces," that tasks take her an "extra long time," that her children are largely "self-sufficient," and that she often naps during the day.

_____

[9] The first factor under 20 C.F.R. § 404.1529(c)(3)(2009).

(Tr. at 266, 267, 270.)  Second, the record is replete with statements consistent with her hearing testimony.

Finally, the ALJ's characterization of the plaintiff as "histrionic," and its effect on his determination of her credibility, bears noting.  In explaining why the opinions of her treating physicians were rejected, the ALJ notes "she has been deemed not credible based on some of her statements and her histrionic presentation at the hearing."  Her lack of credibility therefore affected the basis upon which her treating physician's came to their conclusions and the weight to be given to their conclusions.

At no point in the record is the plaintiff ever characterized by any health care provider or SSA employee as "histrionic," nor is her presentation ever described as overly dramatic or exaggerated. Second, although one might guess what the ALJ considered to be "histrionic" from careful examination of the transcript, he makes no attempt to ground this finding in the record.[10]  The court may not conduct a post-hoc rationalization of an ALJ's decision on the assumption that he followed the correct legal standards; he must explain his findings.  <u>Robinson</u>, 366 F.3d at 1084 (citing <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168-69

_____

[10] At one point during the plaintiff's testimony she asks if she can "get up for a minute;" after an unspecified period of time, upon resuming her testimony the plaintiff's representative states, "Here you go, Teresa, do you need a Kleenex?" (Tr. at 266-67).

(1962) for the proposition that an ALJ's decision should be evaluated based only on the reasons articulated therein).

The ALJ's tone in questioning the plaintiff also bears noting. It is apparent from the record that the ALJ was curt in his interactions with the plaintiff. For example, when, after being posed the question by her representative, the plaintiff was describing her job duties, the ALJ remarked, "We know what a legal secretary is." (Tr. at 263). Later in the proceeding, as the plaintiff is attempting to describe the amount of weight she can lift the ALJ stated, "Okay. We're bumping against a time frame here." (Tr. at 277). Finally, at the end of the hearing the plaintiff posed a question to the ALJ to clarify why she was asked about certain medical problems,[11] to which the ALJ replied "I don't – I like to ask questions that I already know the answer to so just to see what you say." (Tr. at 283). It is therefore possible that any "histrionics" demonstrated by the plaintiff were in reaction to the ALJ's demeanor.

The ALJ generally failed to consider the relevant seven factors demanded in a credibility assessment. Had he considered these factors, he would have noted that the plaintiff made

_____

[11] CLMT: "Can I say something because you asked me, I was under the assumption that you guys knew about herniated discs and carpal tunnel and that kind of stuff." ALJ: "Yeah, I know about it." CLMT: "Oh, okay. Because you asked me about it – "

persistent attempts to obtain relief from her pain[12] by consulting various specialists, trying different treatment modalities, and changing medications. Indeed, she endured numerous diagnostic procedures including MRI and CT scans, she participated in physical therapy approximately thirty-five times over approximately fifteen months, underwent cervical epidural injection and lumbar facet injection, and took various pain medications despite suffering adverse side effects from these medications. Although in the record, none of these factors were addressed in the ALJ's credibility determination.

I therefore conclude the ALJ's determination that the plaintiff lacked credibility was based on his failure to apply the correct legal standard and is not supported by substantial evidence.

B. The ALJ failed to properly apply the Treating Physician Rule.

The Plaintiff contends that the ALJ did not properly consider and weigh the medical opinions of her treating physicians. (Tr. at 253; Pl. Brief at 8). Under the treating physician rule, absent a finding that the treating physician's opinion is not supported by objective evidence, controlling weight is given to the opinion of a treating physician. 20 C.F.R. § 404.1527(d)(2009); Clark v. Commissioner of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

---

[12] A "longitudinal medical record demonstrating an individual's attempt to seek medical treatment for pain ... lends support to an individual's allegations of intense and persistent pain ...." SSR 96-7p.

Moreover, if the ALJ does not afford controlling weight to a treating physician's opinion, this Circuit requires that the ALJ provide "good reasons" for choosing to discount the opinion of the treating physician. Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

An ALJ must consider the following factors in determining whether a treating physician's opinion is to be given controlling weight: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal, 134 F.3d at 503 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

While it is the role of the ALJ to balance and ultimately consider the weight to be given conflicting medical opinions, he must nonetheless either give controlling weight to the determinations of treating physicians or provide a good explanation for failing to do so. Balsamo v. Chater, 142 F.3d 75 (2d Cir. 1998); Snell v. Apfel, 177 F.3d 128 (2d Cir. 1999). Here, the ALJ did neither.

In the instant case, the ALJ made little attempt to apply the above factors. Rather, the primary "factor" he appeared to consider was perhaps "other relevant factors." The ALJ's reasoning was as follows: the plaintiff lacked credibility; as such, he would "*not accept medical findings or opinions that are based*

-18-

*solely or primarily on the [plaintiff's] subjective complaints;*"[13] the opinions of the plaintiff's treating physicians were, in his assessment, based on the plaintiff's subjective complaints; therefore the opinions of these physicians must be discounted.

Specifically, regarding the opinions of the plaintiff's treating physicians, Drs. Gosy and Pawlowski, the ALJ ultimately found:

> "[Dr. Gosy and Dr. Pawlowski's] opinions inaccurate and unreliable and generally inconsistent with objective medical evidence.
>
> If the claimant were as restricted as one would expect based on these opinions, she would be unable to undertake the activities of daily living that she reported.
>
> It <u>would appear</u> that these reports are based primarily on the subjective complaints of the [plaintiff] and she has been deemed not credible based on some of her statements and her histrionic presentation at the hearing. Therefore, both of these opinions <u>appear</u> to be more in the nature of doctors advocating for their patient's disability benefits than providing <u>objective</u> assessments.
>
> They are not supported by the doctor's own notes or by other evidence in the record and are given little to no weight.
>
> The relatively benign <u>objective</u> medical findings do not come close to supporting these drastic limitations." (Tr. at 20-21)(emphasis and separation of text mine).

Because each statement made by the ALJ is legally erroneous, each statement will be considered *seriatim*.

---

[13] Tr. at 18 (emphasis mine).

C.  <u>The ALJ failed to provide "good reasons" for discounting the opinions of the plaintiff's treating physicians</u>.

After discussing various MRI findings, the opinion of Dr. Frost (a one-time treating neurologist) and the opinion of Dr. Holland (a one-time consultative examiner), the ALJ noted that the opinions from Gosy & Associates Pain Treatment Center[14] and David Pawlowski, M.D.[15] "are inconsistent with objective medical evidence and contradictory of each other."  (Tr. at 20).

In terms of the ALJ's finding of inconsistencies with "objective medical evidence," the ALJ commits legal error by failing to articulate the "objective medical evidence" with which these findings are inconsistent.  Under the regulations, objective medical evidence includes "medical signs,"[16] defined as "anatomical, physiological, or psychological abnormalities which can be observed;"[17] such signs include reduced joint motion and muscle spasm.[18]  The ALJ's definition of "objective" is unclear, as he fails to specify the inconsistencies he perceives, and since the record is replete with evaluations in which the plaintiff was found

_____

[14] Whom the plaintiff saw approximately 11 times over approximately two years.  The plaintiff was seen primarily by nurse practitioners and physician assistants.

[15] With whom the patient had contact via office visits and/or phone calls approximately 28 times over approximately two years.

[16] 20 C.F.R. § 404.1529(a)(2009).

[17] 20 C.F.R. § 404.1528(b)(2009).

[18] 20 C.F.R. § 404.1529(c)(2)(2009).

to have reduced range of motion in her cervical spine, occasions where muscle spasm was noted, and imaging studies of the plaintiff's cervical and lumbar spine revealing abnormalities. (Tr. at 104, 107, 111, 113, 143, 158, 219, 220, 221, 226, 228).

Regarding apparent contradictions between the opinions of Drs. Gosy and Pawlowski, the ALJ makes much of minor inconsistencies in the physical capacities evaluation reports generated by Drs. Gosy and Pawlowski. He notes differences in the precise amount of time the plaintiff might be able to sit or stand, whether she would be able to use her hands for particular tasks, and whether she would be restricted from working at unprotected heights. (Tr. at 20). However, he ignores the general consistency between these evaluations: both physicians ultimately opine that the plaintiff cannot use her hands for repetitive movements, that she suffers from pain (rated by both as moderate in degree) for which there is a reasonable medical basis, and that this pain is disabling to the extent that it would prevent her from working full time. (Tr. at 190, 206).

Therefore, I conclude the ALJ's finding that the opinions of plaintiff's treating physicians are inaccurate, unreliable, and inconsistent with objective medical evidence is not supported by substantial evidence.

D. The ALJ committed error by substituting his own judgment for competent medical opinion.

In stating that "it *would appear* that the[] reports [of Drs. Gosy and Pawlowski] are based primarily on [plaintiff's] subjective complaints,"[19] the *ALJ* essentially determined, without comment, the basis on which these *physicians* produced their reports. "In analyzing a treating physician's report, 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion,' nor can [he] 'set his own expertise against that of a physician who submitted an opinion....'" <u>Gilbert v. Apfel</u>, 70 F.Supp.2d 285, 290 (W.D.N.Y. 1999)(quoting <u>Balsamo v. Chater</u>, 142 F.3d 75, 81 (2d Cir. 1998)). By finding that the above opinions were based on "subjective" complaints, the ALJ inappropriately speculates on the manner in which the plaintiff's physicians arrived at their opinions, thereby interjecting himself into the medical decision making process.

However, even if the opinions were based on subjective complaints, this would not constitute a "good reason" for dismissing the opinions of the treating physicians: first, the plaintiff's subjective complaints were improperly discounted based on an unsupported credibility finding, and second, as discussed below, a plaintiff's application for disability cannot be rejected simply because it is based on subjective complaints.

---

[19] Tr. at 20 (emphasis mine).

The ALJ goes on to note that these reports are in the nature of physicians' mere advocacy on behalf of their patient, implying that they are essentially unfounded and not based on bonafide medical findings.  However, in the absence of a more specific reason to suspect the veracity of a medical report, a doctor "advocat[ing] his patient's cause is not a good reason to reject his opinion as a treating physician."  McGoffin v. Barnhart, 288 F.3d 1248, 1253 (10th Cir. 2002)(citing Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987)).

> E.  The ALJ committed error by improperly discounting the plaintiff's subjective complaints and requiring her to prove disability through "objective" medical evidence.

Courts have repeatedly held that objective evidence is not required to prove disability. See Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)("As a general matter, 'objective' findings are not required in order to find that an applicant is disabled.").  The regulations explicitly state that a claimant's statements will not be disregarded because they are based on subjective complaints.[20]  To the contrary, when "objective" medical evidence appears to be lacking, and symptoms appear to be in excess of such evidence, the regulations require the adjudicator  to

---

[20] "[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."  20 C.F.R. § 404.1529(c)(2)(2009).

consider seven factors (discussed above) relevant to a claimant's symptoms.

Here, where the ALJ's determinations regarding the plaintiff's credibility and the veracity of her treating physicians' opinions turned on a perceived lack of "objective" medical evidence, the ALJ erred. As discussed above, the ALJ ignored the majority of the record and failed to address the requisite factors in reaching his determinations; his contention that the plaintiff's "longitudinal medical history is not consistent with total disability" is not supported by substantial evidence. (Tr. at 18.)

IV. <u>The ALJ erred in finding that the plaintiff could perform a range of sedentary work</u>.

Following a review of the record in its entirety, I find that the opinions of plaintiff's treating physicians, along with other evidence, demonstrates that the plaintiff is disabled as a result of her various musculoskeletal impairments and headaches and does not possess the capability to perform sedentary work.

For the plaintiff to be entitled to disability benefits, she must have a medically determinable impairment that is expected to result in death or last for a continuous period of time greater than twelve months, limiting her functional ability to do her past relevant work or other work that exists in the national economy. 42 U.S.C. §§ 423(d) and 1382(a)(3). In this case, the ALJ concedes that the plaintiff suffers from a combination of impairments that are "'severe,' since they have resulted in significant limitations

on the claimant's ability to perform basic work activities."
(Tr. at 17).  However, in part five of the requisite five-part
disability evaluation, the ALJ ultimately found the plaintiff had
the "residual functional capacity to perform a range of sedentary
work." (Tr. at 18).  This Court disagrees with the ALJ's analysis
on this finding as explained above, and determines that the ALJ's
decision was not supported by substantial evidence.

In making his decision regarding the plaintiff's residual
functional capacity, the ALJ erroneously assessed the plaintiff's
credibility.  Based on this assessment, he effectively dismissed
the plaintiff's subjective complaints and the opinions of her
treating physicians, which constitute the majority of evidence in
the record.  Further, he failed to consider a formal functional
capacity evaluation performed at the request of the plaintiff's
treating physician, Dr. Grand, which found the plaintiff "cannot
tolerate Sedentary for an 8-hour day secondary to her extremely
decreased endurance, numbness in hands and reported pain/headaches
with activity."[21]  (Tr. at 114).

---

[21] The physical therapist who performed the evaluation, Kristie K.
Coleman, found the plaintiff "demonstrated the ability to perform an
occupation within the LIGHT Physical Demand Classification for a 4-hour day as
defined by the Dictionary of Occupational Titles consistent with the enclosed
capabilities.  However, she is limited in her ability to perform standing
tasks at more than an occasional level.  She also demonstrates very limited
endurance with repeated activities.... secondary to her increased symptoms
with prolonged activities and very limited endurance it is recommended she
only work 4 hour days."  (Tr. at 114).

Instead, the ALJ relied on the opinion of one-time examining neurologist, Dr. Holland,[22] to substantiate his RFC finding at step three, and the hearing testimony from a vocational expert to substantiate his finding at step five. However, the testimony on which the ALJ relies in step five is based on a hypothetical posed to the expert in which the hypothetical claimant had physical and non-exertional capabilities beyond those actually possessed by the plaintiff. (Tr. at 280-82). Indeed, when a hypothetical was posed that more closely approximated the plaintiff, the vocational expert testified that there would be no jobs "at a competitive level of employment" for such an individual. (Tr. at 283). Further, both of the plaintiff's treating physicians opined that she suffered from pain that was disabling to the extent it would preclude working full time at even a sedentary position. (Tr. at 190, 206). While the statements of the plaintiff's treating physicians regarding disability are of an issue reserved to the Commissioner, at the same time "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p.

The record, when considered in its entirety, contains persuasive proof that the plaintiff is disabled under the Social Security Act. The first "objective" indication of the plaintiff's symptoms is from her treating physician, Andrew Harbison, D.O. Dr. Harbison, who treated the patient briefly noted on December 23,

---

[22] Her opinion was that the plaintiff had "only mild limitation to repetitive lifting." (Tr. at 20, 144).

2003 that although the patient reported her back pain as generally improved, physical exam included "+ slump test b/l rt > lt [bilateral, right greater than left]," and his assessment was of "focal sm[all] disc herniation [with] biforaminal stenosis and mild central stenosis [with] radicular s/s [signs and symptoms]." (Tr. at 136).

Her subsequent primary care physician Dr. Pawlowski noted on his physical capacities evaluation that plaintiff had evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine and sensory loss, along with spinal arachnoiditis confirmed by MRI with accompanying painful dysesthesia. (Tr. at 207).[23] Further, at various times, his treatment notes document complaints of pain, often with poor response to treatment (e.g. epidural injection; various medications), cervical spine tenderness, decreased range of motion, positive slump test, and muscle spasm. (Tr. at 202-22).

Similarly, Dr. Gosy's notes[24] generally substantiate the above. For example, the "objective exam" typically revealed tenderness in the plaintiff's lumbosacral region, and decreased active range of motion. (Tr. at 187, 191, 193). During the plaintiff's 2006 course of treatment, notes indicated "right straight leg raise: provocative," and "left straight leg raise: with low back pain."

---

[23] This appears to correspond to Listing 1.04B.

[24] These notes often indicate "Seen by:" a nurse practitioner/physician assistant and Dr. Gosy, although Dr. Gosy does not typically sign the notes.

(Tr. at 242).  The plaintiff consistently complained of cervical and lumbar pain, and notes indicate numerous changes to the her medications, as she was achieving less than optimal pain relief (Tr. at 241-48, 251-52).  The list of the plaintiff's various prescriptions spans two pages.  (Tr. at 249-50).  Medications prescribed by Gosy & Associates have included Klonopin, Baclofen, Zanaflex, Oxycontin, Talacen, Norflex, Valium, and Duragesic Transdermal patch (fentanyl).

The Gosy clinic ultimately diagnosed the plaintiff with fibromyalgia, and after complaining of headaches over the course of her treatment, on June 13, 2006, Michele Fisher, M.S., PA-C and Dr. Gosy opined that the plaintiff "has a form of migraine headache disorder, possibly triggered by the neck pain of her fibromyalgia." (Tr. at 252).  The same note indicates the plaintiff suffers from "intractable pain through the spinal axis due to fibromyalgia," and that the plaintiff rated her pain relief as "mild" despite taking a combination of Oxycontin, Norflex and Talacen.  (Tr. at 252).

The plaintiff was also treated by Dr. Grand, a neurosurgeon. Some of his notes indicated restricted range of motion of the plaintiff's neck.  On January 19, 2004 he noted "some slight limitation of motion of the neck from side to side."  (Tr. at 111). At that visit he stated that "MRI scan of the cervical region shows degenerative disc disease and mild cord compression at C4-5 and C5-6."  He later performed a cervical epidural steroid injection on March 11, 2004 to treat what he diagnosed as cervical radiculopathy.  (Tr. at 101).  On May 17, 2004 he noted "limited

motion in the neck." (Tr. at 107). Ultimately, Dr. Grand no longer recommended surgery, which he initially considered, apparently for two reasons: "the original discs were somewhat small and do not directly correlate with her current radiculopathy and other discomforts." (Tr. at 107).

Further, the plaintiff was seen by Dr. Marc Frost, a neurologist, when she experienced cold and burning sensations on her face. Dr. Frost noted, "MRI scan of [plaintiff's] cervical spine demonstrated significant stenosis. CT scan of her lumbar spine demonstrated some mild degenerative disc disease." His impression was "facial symptoms on the right of unclear etiology. These are unrelated to her cervical stenosis. Certainly a neuralgia needs to be considered." (Tr. at 102, 103). The CT report referenced by Dr. Frost indicates a finding of "moderate broad-based disc herniation at the L4-5 interspace [resulting] in a mild to moderate central stenosis. The foramen at this level appears significantly encroached bilaterally." Impression was "focal small disc herniation at L4-5 with resultant moderate biforaminal stenosis and mild central stenosis." (Tr. at 104). MRI results also revealed cervical spine abnormalities, including "cervical spondylopathy, most affecting the midcervical spine ... C4-5 right paracentral disc herniation which abuts the cord and causes mild canal stenosis ... C5-6 dorsal disc osteophyte complex which also flattens the cord, and causes mild canal stenosis, worse than at C4-5." (Tr. at 226).

Evidence from "other sources" includes the functional capacity evaluation by Kristie K. Coleman, P.T., discussed above (Tr. at 113). At that evaluation, the plaintiff was noted to "demonstrate decreased cervical range of motion during testing." (Tr. at 113). Importantly, it should be noted that Ms. Coleman stated that the results of the evaluation suggested that the plaintiff "gave a reliable effort ... her overall behavior appeared consistent both when she was directly and indirectly aware of observation. Facial expressions, body language, and verbal complaints of pain appeared consistent with expected responses." (Tr. at 113). This level of detailed description regarding plaintiff's positive attributes is in sharp contrast with the conclusory and unelaborated comment from the ALJ characterizing the plaintiff as "histrionic."

Without exception, plaintiff was noted to have tenderness to palpation at each physical therapy appointment. On more detailed intake evaluations, she was also noted at various times to have decreased range of motion, positive slump test, decreased strength, positive cervical compression test, point tenderness, trigger points and muscle spasms (Tr. at 148-185).

Finally, observations from an interview conducted by the SSA[25] indicate that the plaintiff had difficulty with sitting, standing, and walking. Narrative by the interviewer states, "Claimant was well dressed and very nice. She appeared to be in back pain. She moved around in her seat a lot. She sat kind of stiff with her

---

[25] Disability Report - Field Office - Form SSA-3367, which appears to be dated August 10, 2004 and completed by C. Crumpley.

shoulders almost up to her ears.  It seemed that she was afraid to move because it would cause pain.  She walked slow and kind of hunched over."  (Tr. at 65).

By considering the opinions of the plaintiff's treating physicians and other sources in conjunction with the plaintiff's hearing testimony, and the ALJ's conclusion that "the [plaintiff's] ability to perform all or substantially all of the requirements of [the full range of sedentary] work has been impeded by additional limitations...," I find that the plaintiff is not capable of performing sedentary work.  (Tr. at 21.)  In all, the record provides ample documentation of "objective" findings and substantial evidence that the plaintiff was disabled within the meaning of the Social Security Act.

## CONCLUSION

For the reasons set forth above, this Court finds that the Commissioner's decision that the plaintiff is not disabled was based on errors of law and was not supported by substantial evidence. The record contains substantial evidence of disability such that further evidentiary proceedings would serve no purpose. I therefore grant judgment on the pleadings in favor of the Plaintiff and remand this matter to the Social Security Administration for calculation and payment of benefits.

ALL OF THE ABOVE IS SO ORDERED.

                              S/Michael A. Telesca
                              _____
                              Michael A. Telesca
                              United States District Judge

DATED: Rochester, New York
       October 22, 2009